PAT LETULI, substituted for OLO LETULI, Plaintiff

v.

MARIA LEITUALA, PETER GEBAUER, M & N INC.,
PAULINE GEBAUER, MAPU JAMIAS, and ILIGANOA
SOGIALO, Defendants

High Court of American Samoa
Land and Title Division

LT No. 20-01

January 29, 2004

Before RICHMOND, Associate Justice, and LOGOAI, Chief Associate Judge.

Counsel: For Plaintiff, David P. Vargas
For Defendants, Asaua Fuimaono

## OPINION AND ORDER

The original Plaintiff Olo Letuli ("Letuli")[1] commenced this action to recover damages for multiple past trespasses and to permanently enjoin future trespasses across a road he alleges to be within his registered individually owned land ("Letuli land") in Fogagogo, American Samoa. Defendants Maria Leituala ("Leituala"), Peter Gebauer ("Peter"), M & N Inc. ("MNI"), Pauline Gebauer ("Pauline"), Mapu Jamias ("Mapu"), and Iliganoa Sogialo ("Iliganoa") answered, alleging that the road is open to public use, but is actually on or at least partially on land originally registered as the "family land of Leituala Maria" ("Leituala land"). MNI, Pauline, Mapu, and Iliganoa also counterclaimed against Letuli for damages for lost income due to Letuli's actions delaying the opening of their business on Leituala land. The ultimate issue is the location of the

---

[1] Letuli passed away on July 22, 2003. On December 12, 2003, pursuant to T.C.R.C.P. 25(a), Pat Letuli, his surviving spouse and as his personal representative, replaced him as the party Plaintiff. References below to Letuli are to include Pat Letuli where contextually required.

original boundary between the Letuli land and the Leituala land.

Trial was held on January 16, 17, 22, and 30, and February 5, 2003. The principal individual parties and both counsel were present on these trial days. The Court viewed the land at issue in the presence of these parties and both counsel on January 22, 2003. Due to Letuli's illness, however, a date to take his rebuttal testimony and conclude the trial was postponed. The parties eventually resolved this impasse by filing Letuli's affidavit in lieu of his personal presence. Counsel also agreed to submit written final arguments, and the Court established a schedule for this purpose.

## Findings of Fact

The Letuli land is located immediately to the south of the Leituala land in Fogagogo, American Samoa. Both parcels are situated a relatively short distance east of the southerly end of the Pago Pago International Airport and have ocean shoreline boundaries at their east end. The common boundary between the parcels is the principal issue to resolve. The location of the boundary will in turn determine whether the road at issue is located within the Letuli land or the Leituala land, or partially within each parcel, and the consequential judicial relief flowing from the road's location. Though the family relationship does not alter these determinations, we note that Letuli and Leituala are blood relations.

Letuli lived on the Letuli land with other family members from approximately 1926 until he pursued a career outside the Territory in the entertainment field near the beginning of the World War II era. He returned around 1962 and lived on the same land. In November 1962, Letuli had the Letuli land surveyed, totaling approximately 44.32 acres. On March 26, 1971, he offered to register the surveyed Letuli land as his individually owned land in 1971. The offer was met by several objections. Ultimately, however, on December 1, 1972, this Court determined that the Letuli land was Letuli's individually owned land and ordered its registration as such.

In May 1971, Suapilimai T. ("Suapilimai"), on Leituala's behalf, had the Leituala land surveyed, totaling approximately 5.933 acres ("the Leituala land"). On May 11, 1971, Suapilimai offered to register the Leituala land. On August 14, 1971, after completion of the registration process, the Leituala land was registered as the "family land of Leituala Maria." Despite the "family land" characterization of the registrant in the certificate of registration, the evidence clearly shows, at least for purposes of this action, that the registration was intended to be for Leituala as her individually owned land. The history of the Leituala land before registration was not developed in the evidence, but apparently the area was unoccupied up to that event. Three subsequent transactions

affecting the Leituala land are particularly relevant to the present controversy.

The first transaction was a lease. On April 28, 1993, Leituala leased approximately 2.2 acres of the Leituala land to Peter for a term of 99 years, "commencing on May 1, 1993, and ending on April 31, 2092" ("the leased land"). The rent was initially $100.00 per month, but was increased to $500.00 per month for the remainder of the term upon any commercial use of the leased land. The leased land is situated at or near the east end of the Leituala land. The survey attached to the lease shows that approximately 95.82 feet of the southern boundary of the leased land at the southwest corner abuts the road at issue. This corner area of the leased land is near the point where Letuli maintains a gate across the road and a guardhouse, and the road turns soutward towards Letuli's home on the Letuli land.

Peter and Iliganoa were a married couple in 1993. Pauline is their daughter. They divorced on December 6, 1996, and Peter's leasehold was awarded to Iliganoa in trust for the benefit of their three children as part of the division of their marital property.[2] After the divorce, Iliganoa, Mapu and Pauline (together "the three owners") organized and own MNI, which now conducts the business known as the Maliu Mai Beach Resort on the leased land. MNI and the three owners want to have customers and others enter and leave the Beach Resort from the road at issue immediately west of the gate and guardhouse. In addition to the main structure of the Beach Resort, MNI also constructed four small Samoan style houses or fales as part of the Resort facilities immediately north of where Leituala, Iliganoa, Mapu and Pauline believe to be the location of the southern boundary of the leased land and the Leituala land in this area.

The Beach Resort operation is the principal catalyst of the present controversy between the parties. Letuli disliked the existence of a nightclub in this area in general, and the noise emanating from and late-hour operations of the club in particular. He also claims that the four fales, or portions of them, are on the Letuli land. He therefore vigorously opposed MNI's variance application submitted to the Zoning Board of American Samoa on September 2, 1999. Eventually, by a decision issued on October 4, 2001, the Zoning Board gave final approval of the variance for a three-year period, with certain conditions. The conditions pertained to parking facilities, midnight closure, security for patrons and neighbors, proper sewage disposal, no use of strobe lights, no traffic access to the business premises across the road at issue,

---

[2] We take judicial notice of the divorce action before this Court, DR No. 35-95. The decree, granting Iliganoa a divorce from Peter and providing for division of their property, was entered on December 6, 1996.

no noise audible at Letuli's residence, and compliance with all applicable laws. Not entirely satisfied with the situation, Letuli brought this action on October 26, 2001, to address his continuing concerns. He wants the road declared to be his private road and access to the Beach Resort over it permanently enjoined. He also wants the fales entirely removed from the Letuli land. On the other hand, MNI and the three owners seek public access to the Resort across the road and lost income caused by the substantial delay in opening the Beach Resort as a result of the Zoning Board proceedings.

The second transaction was a conveyance. Also on April 28, 1993, Leituala conveyed approximately 1.404 acres of the Leituala land to Peter and his heirs ("conveyance area A"). The conveyance was registered as Peter's individually owned land on May 19, 1993. The survey attached to the deed shows that conveyed parcel A is situated approximately 148.26 feet west of Peter's leased land and abuts the road at issue for approximately 90.41 feet. Conveyance area A was awarded to Iliganoa in her divorce from Peter.

The third transaction was also a conveyance. Peter had acquired substantial portions of the Leituala land between the leased land and conveyance area A. On December 20, 1996, he sold approximately 0.403 acres of this area to Lisa Malae Theno and her heirs ("conveyance area B").[3] The survey attached to the deed shows that conveyance area B abuts the road at issue for approximately 136.76 feet from the leased land, leaving a strip approximately 12 feet wide between conveyance area A and conveyance area B to allow access from the road at issue to the area north of conveyance area B.[4] Again, title to this area immediately north of conveyance area B was formerly in Peter's name and was transferred to Iliganoa by the divorce decree. Unlike the silence in the deed of conveyance area A, the deed of conveyance area B included, without specificity however, "all the tenements, appurtenances thereunto belonging," and the attached survey shows the letters "R.O.W." marked on the road at issue, meaning "right of way."

The road at issue runs in an east-west direction for approximately 800 feet. It essentially enables access to the ocean shoreline areas of both the

---

[3] The divorce decree awarded the site of Iliganoa and Peter's marital home, their individually owned land also within the Leituala land, to Iliganoa. The decree specifically authorized sale of their other individually owned land as was necessary to provide funds to pay their marital debts. Any such individually owned land not sold for this purpose was awarded to Iliganoa in trust for the three children of their marriage.

[4] The registration date of the conveyance area B transaction, if it was registered, is not in evidence.

Letuli land and the Leituala land. It was once a branch of a footpath system extending from Vaitogi at the westerly end to the Fogagogo area and then to and beyond the present Pago Pago International Airport area at the easterly end. The path system originated many, many years ago, long before vehicles appeared in American Samoa. It certainly existed long before and during the time Letuli first lived on the Letuli land.

Eventually, after vehicles were introduced, a road system began to be constructed in this part of the Territory. The road at issue is shown on Letuli's 1962 survey. The present Pago Pago International Airport was first developed in late 1950s and early 1960s. A road, now commonly known as the airport road, was built from the airport terminal area westward to Ili`ili and beyond. Another road off the airport road towards and around the westerly end of the airport was also constructed and became connected with the road at issue. It also extended beyond this junction in a northerly direction, more or less parallel with the runway, for a short distance to allow access to the public sewage treatment plant. This road extension also enables access to private land in this immediate area, including the Leituala land, and is presently used as the primary means of reaching the Maliu Mai Beach Resort.

Letuli was instrumental in promoting development, including eventual paving, of the road to and around the westerly end of the airport. He also improved the road at issue for vehicular traffic in the 1960s and has since maintained and paved it. The extension of the road beyond the junction with the road at issue to the sewage treatment plant and to the Leituala land and other private land is still not paved.

The qualified, testifying professional surveyors cannot pinpoint the location of the boundary between the Letuli land and the Leituala land. The boundary is clearly near or on the road at issue. The two parcels and surrounding areas, including both the airport property and several other private properties, have been extensively surveyed. The surveyors agree that these various surveys have technical interrelationships for survey purposes. They also agree that the various surveys contain significant, presently irreconcilable errors that make accurate identification of the correct metes and bounds of the original boundary impossible.

Having the survey problems in mind, the testifying surveyors opined that the boundary may be entirely within the present road at issue. Pioneer roads, as the road at issue originally was, are readily subject to diversions in course due to common usage, weather influences, or other moderating circumstances, and likely occurred to some extent to this road. Thus, the surveyors also opined that the boundary could have been either entirely on the north or Leituala side, or on the south or Letuli side, or partially on either or both sides, of the present road. Looking to the original survey drawings of the Letuli land and the

Leituala land, it appears that the original surveyors intended to locate the boundary within or partially along the northern edge of the east-west stretch of the road as it existed in 1962 and 1971. In sum, the expert surveyors' testimony does not of itself provide a definitive basis to locate the actual original boundary.

There are, however, several significant landmarks along the road at issue to also take into account. First, there are rock walls for extending distances along the north and south sides of the road at issue. Letuli installed and paid for these roadside walls, on the south side around 1968 and on the north side around 1980, when the housing utilized by the government was built. Second, an older north-side rock wall ("older wall") and hedges still exist just north of a portion of the north roadside wall installed by Letuli. Finally, two coconut tree stumps and three fence pipes line up, more or less, along the portion of the road at issue adjacent to conveyance area A and conveyance area B.

The roadside walls, hedges, coconut stumps, and fence pipes fail to indicate where on the road at issue the boundary lies. The placement of the most significant landmarks, the roadside walls and hedges, occurred after the division of the land and the original surveyors' work. The landowners could not place standard landmarks, such as walls, hedges, fence pipes, and coconut trees, on the road to protect their privacy and demarcate the actual land boundary. In order to keep the road useable, they had to put these landmarks on one side of the road or the other. In sum, the landmarks along the road do not of themselves provide a definitive basis to locate the actual original boundary.

Thus, even with possible movement, the road itself serves as the best landmark to indicate the boundary location. Around the time of the 1962 survey and before either party's registration, the road's position stabilized. In the 1960s, Letuli improved the road to accommodate for the vehicular traffic. Subsequent landmarks around the road, such as the south roadside wall, the older wall, and hedges, further fixed the road in its current position.

In closing our factual findings, we note one more relevant landmark. There is a rock wall ("fale wall") immediately south of the four fales built by MNI and the three owners. Letuli had the fale wall erected at his cost in the early 1990s. The fale wall was constructed along a line of prior existing luatalotalo plants. Letuli claims, however, that the construction crew misunderstood or disregarded his instructions and located the fale wall south of the actual boundary of the Letuli land in this area, which induced the fale encroachments on his land.

## Legal Analysis and Conclusions

### I. Location of Boundary Along the Road

■ The location of a plot's boundaries is controlled by the intention of the parties that divided the land at the time of the division. 12 AM. JUR. 2D *Boundaries* § 2 (1997). When determining the correct boundaries of land parcels, we may consider different surveys of the land, monuments referenced by the surveys, physical landmarks, direction and distance, and overall area. *See, e.g., Huff v. Brown*, 23 A.S.R.2d 115 (Land & Titles Div. 1993). We will judicially determine the location of a boundary line where the relevant surveys are inconsistent or conflicting and cannot be explained by available evidence. *See Gurr v. Scratch*, 28 A.S.R.2d 15, 17 (Land & Titles Div. 1995).

We fairly and reasonably determine the common boundary between the Letuli land and the Leituala land to be along the center of the road at issue. Placing the boundary down the center of the road is a reasonable approximation of where the original surveyors located the boundary when the other landmarks do not conclusively show the boundary location. *See Gurr*, 28 A.S.R.2d at 17-18. Any variance between the true intended boundary and our determined boundary is slight and tolerable. The variance is slight, because the course of the road stabilized before the two land registrations. The variance is tolerable because placing the boundary down the road preserves the intent of Letuli and Leituala. Each landowner registered portions of land running the length of a significant portion of the road, so both sides desired some right to control the road's usage. Whether owning half or a significant portion less than half of the road, partial ownership of the narrow road effectively gives each party the right to prevent others from using the road.

### II. Easements On the Road

■ An easement or license by estoppel is created when a representation is communicated by a party, and is believed and relied upon by another party. *See Foster v. Olotoa*, 3 A.S.R. 76, 81 (Trial Div. 1953). The representation creating an easement must be made by verbal statements or conduct; passive acquiescence does not constitute a possible representation creating an easement. *Stallman v. Newman*, 9 S.W.3d 243, 247 (Tex. Ct. App. 1999).

■ After registration, both Letuli and Leituala had easements by estoppel to use the portion of the road that he and she did not own. Both individuals registered sections of land running on significant portions of the road, which was substantial enough to be marked on the 1962 survey. Offering to register these portions of road publicly demonstrated intent

225

to permanently use the unowned portions of the road, because neither could have intended to divide the road such that, potentially, neither side could use it. Both individuals needed some right to the full road to use it. Thus, each party had an obligation to object not only to dispute the other's registration offer for part ownership of the road, but to object to the other's intent to permanently use the road. Failure to assert full ownership of the road at the time of both registrations constitutes affirmative approval by both landowners of a reciprocal easement that allows both landowners to use the road. The two registration offers occurred within two months of each other, which implies a purposeful division, giving further evidence of an easement establishing intent by both parties.

Both landowners reasonably believed in good faith that they could use the road without restriction based on their successful registration and use of the road before and after the registrations occurred. Both landowners relied on having an easement by refraining from protesting when the other used unowned portions of the road for decades. Furthermore, Letuli paved the road and both land owners made substantial improvements on their land relying on accessibility by the road.

■ We infer from the circumstances of this case that the scope of both Letuli's and Leituala's original easement includes access for purposes of the land's commercial development. The scope of an easement not defined by a grant is limited to uses "as might reasonably be required by normal development of the land." *Le`i v. Letuli*, 25 A.S.R.2d 33, 36 (App. Div. 1993) (citations omitted). The road has been traditionally open for public access. Letuli and Leituala each own significant portions the road. Letuli used the road for his own nightclub on the Letuli land. Because of this broad easement, we find that that Letuli and Leituala are estopped from denying the other authority to permit use of the road. Letuli cannot prevent Leituala from allowing MNI, Iliganoa, Mapu, Pauline, or Peter use of the road, even to support the traffic from a commercial establishment like Maliu Mai.

■ Where use of an easement is shared, the costs of repair and maintenance should be equitably distributed among all users proportionately to the approximate usage of each user. *Lindhorst*, 616 P.2d at 453. Necessary and reasonable repairs must be made so as not to unduly burden the servient tenants. *Id.*

We note that MNI's usage of the road in a commercial endeavor will far exceed the useage of others who share the easement. We find it equitable that MNI cover the costs of road maintenance and repair alone to keep the road in such a state of repair so as to not burden the users of the common right of way along the road. Our apportionment of the maintenance responsibility for the road is reasonable. We base our

decision on each user's proportionate use. Calculating a percentage formula for repair liability with absolute precision is unnecessary. *Lindworst v. Wright*, 616 P.2d 450, 453, 455 (Okla. Ct. App. 1980). Also, we make this apportionment in consideration of Letuli's prior unaided efforts to maintain the road.

### III. Events Subsequent to Land Registration

Letuli argues that subsequent to the land registration, the boundary along the disputed road was moved to the north side of the road based on agreement, acquiescence, or estoppel. Letuli's equitable arguments attempt to bind Leituala and her successors in title or leasehold to a boundary move, because Letuli was allowed to build the north roadside wall, improve the road, and encountered little or no opposition to other assertions of control over the road. Defendants counter, arguing that Letuli never asserted exclusive ownership of the road until the establishment of Maliu Mai, and that, as a successor in title of Leituala, Peter evidenced control over the road by granting a right of way along with the December 20, 1996 land sale. Considering both arguments, we find that the defendants with ownership or use interests in the road have not lost their interests in the road, but have given up their rights to remove the north roadside wall.

■ Before giving legal effect to land division by agreement, acquiescence, or estoppel, we look for express or implied intent of the landowners involved for the division to serve as the boundary between lands. *See Falefia v. Sipili*, 7 A.S.R.2d 1, 3-4 (Land & Titles Div. 1988).

■ Defendant landowners and occupiers never intended to move the boundary on the road and give up the right to use and grant permission to use the road. First, Defendants with an ownership or use interest in the road were obligated to let Letuli improve the commonly used road. When a common right of way is shared, a party should not interfere with the other's improvements of the right of way. *Lindhorst*, 616 P.2d at 455. Without a prior agreement between the users of the road, Letuli made such improvements for his own benefit, with benefit going to his neighbors as a collateral effect. Second, Defendants' continued to use the road and Peter granted an express easement on the road. Third, the north roadside wall serves as a privacy barrier desired by the Defendant landowners and occupiers. The roadside wall augments the privacy barrier that was intended when building the older wall and planting hedges along the road.

While retaining ownership or use rights of the road, Defendants with an ownership or occupant right to land along the road lost their right to have the north roadside wall removed. They acquiesced to the placement of the wall. They made no argument to remove the north roadside wall at

the time of construction or when arguing this case before us.

## IV. Location of Boundary Along the Fales

Though we found no agreement, acquiescence, or estoppel regarding movement of the land boundary line along the road, we find that the boundary line from the disputed road towards the ocean traversing the length of the fale wall has moved. The parties had recognized a boundary that lies alongside where the fale wall is now. Leituala showed approval of this boundary division by not arguing for removal of the fale wall before us and by accepting the lautalotalo plants that antedate the fale wall as landmarks for the boundary. Letuli showed approval of this boundary division by constructing the fale wall along a boundary other than the true boundary and by failing to move it when he thought that it was misplaced. We are forced to assume that the boundary line has moved to a position closely tracing the fale wall on Leituala's side of the wall.

## V. Interference with Business

MNI and the three onwers argue that Letuli tortiously interfered with their Maliu Mai business due to objections Letuli made before various American Samoa Government agencies. While the objections may have caused delay, they do not constitute tortious interference. Among other elements, we require a showing of malice before holding a party liable for interference. 45 AM. JUR. 2D *Interference* § 7 (1999). Letuli did not act with malice by making rightful and legitimate objections to government agencies.

## VI. Costs and Fees

Court costs are allowed to the prevailing party as matter of course unless the Court otherwise directs. T.C.R.C.P. 54(d); *Pago Petroleum Prod. v. Ye Ahn Moolsoan, Ltd.*, 29 A.S.R.2d 34, 37 (Trial Div. 1995). Because our holding roughly restores the rights of the parties before the establishment of Maliu Mai, we find that neither side prevailed, so we award no costs to either party on the boundary issue. However, Letuli prevailed in defending against the interference claims. We award Letuli costs incurred concerning the interference claims.

We deny both parties' requests for attorney's fees. The general rule is against recovery of attorney's fees by a party that incurs them in enforcing a claim against another. *Interocean Ships v. Samoa Gases*, 26 A.S.R.2d 28, 41 (Trial Div. 1994). Unless parties contractually agree to pay attorney's fees, we have awarded attorney's fees only in instances where required by statute, or where an opposing party has acted wantonly, oppressively, or in bad faith. *Fiaui v. Faumuina*, 27 A.S.R.2d

36, 42 (Trial Div. 1994); *Samoa v. Gibbens*, 3 A.S.R.2d 121, 123 (Trial Div. 1986). Where no legal basis for an award of attorney's fees has been stated, we have denied a party's application for such fees. *Samoa Products v. Pereira*, 3 A.S.R.2d 45, 46 (Trial Div. 1986). The parties have no agreement on payment of attorney's fees. Neither party has identified a statutory basis for awarding attorney's fees. As discussed, we find none of Letuli's actions constitute malicious tortuous interference. Similarly, parties must also pay the fees of their own expert witness surveyors.

## Order

1. Boundary

Part of the northern boundary between the Letuli land and the Leituala land is reestablished as a line down the center of the disputed road between the two lands. The other part of the northern boundary now traces the Leituala side of the rock wall south of the fales at issue. A direct, north-south running boundary line connects the two parts of the boundary line. Within the next 120 days, the parties shall have this boundary resurveyed and recorded with the Territorial Registrar. Letuli shall pay half the cost of the resurvey, monumentation, and recordation; Defendants shall equally share the other half of the cost.

2. Easement

The land at issue originally belonging to Letuli is held subject to an easement of successors in title to the land at issue originally belonging to Leituala that allows use of the road at issue. The land at issue originally belonging to Leituala is held subject to an easement of successors in title or leasehold to the land at issue originally belonging to Letuli that allows use of the road at issue.

3. Interference with Business

Letuli is not liable for interference with the business operations of MNI and the three owners' Maliu Mai Beach Resort. Letuli is entitled to court costs for defending against this claim, to be established with a properly submitted affidavit.

It is so ordered.